THE STATE, EX REL. THOMAS R. WOOLLEY, CUSTODIAN OF SCHOOL MONEYS OF OCEAN TOWNSHIP SCHOOL DISTRICT, IN MONMOUTH COUNTY, v. SAMUEL W. HENDRICKSON, COLLECTOR OF TAXES OF THE BOR-OUGH OF DEAL, IN MONMOUTH COUNTY.

Submitted December 1, 1904—Decided February 27, 1905.

1. The act of October 19th, 1903, entitled "An act to validate taxes heretofore levied," &c. (*Pamph. L., Special Session, p.* 96), is constitutional.

2. Said act has the effect of validating all appropriations, taxes and assessments theretofore made, levied and imposed, and all other acts theretofore had, passed, done or taken for school purposes under or pursuant to the provisions of the General School laws of 1900 and 1902, which laws, respectively, were declared unconstitutional in *Lewis* v. *Jersey City,* 37 *Vroom* 582, and in *Riccio* v. *Hoboken,* 40 *Id.* 649.

3. Upon a review of the General School law of October 19th, 1903 (*Pamph. L., Special Session, p.* 5), together with the validating act approved on the same day (*Pamph. L., Special Session, p.* 96)—*Held,* that this legislation had not the effect of disarranging pending proceedings for the assessment and collection of taxes already ordered to be raised to meet the payment of school bonds maturing during the school year, even in cases where, by section 32 of the new General School law, the boundaries of school districts were changed, and notwithstanding the provisions of section 34 respecting the transfer to new school districts of the obligation to pay outstanding indebtednesses of the former school districts.

4. Section 33 of the new General School law (*Pamph. L.* 1903, *Special Session, p.* 15) indicates a legislative intent to postpone the operation of the act, with respect to all fiscal adjustments between new school districts and the former school districts, until the end of the then current school year.

5. *Quære.* Whether the establishment of new boards of education required for the new districts created by section 32 of the act (*Pamph. L.* 1903, *Special Session, p.* 14), and the assumption by new boards of education of outstanding indebtednesses as required by section 34, were not intended to be postponed until after the annual school election that was to be held in March, 1904?

On application for a *mandamus.*

Before Justices FORT and PITNEY.

For the relator, *John W. Slocum.*

For the respondent, *Robert L. Lawrence.*

The opinion of the court was delivered by

PITNEY, J.   This is a rule to show cause why a *mandamus* should not be issued to require the collector of taxes of Deal borough, in the county of Monmouth, to pay over to the relator, as custodian of school moneys of Ocean township school district, certain moneys in his hands belonging to that district.   The controversy is with respect to the sum of $3,057.19, which was assessed in the year 1903 upon the taxpayers resident in Deal borough for school purposes for the school year 1903-1904, collected by the respondent, then being tax collector of the borough, and demanded by the relator on June 11th, 1904 (prior to the termination of the school year), the relator then being custodian of school moneys of the Ocean township school district, a district that included the territory of the borough of Deal at the time the taxes were ordered and assessed.

It is admitted that since the year 1894 the township of Ocean (outside of the Long Branch school district) constituted a township school district, including the boroughs of

Deal and Allenhurst, until changed by the new General School law of October 19th, 1903.

It is not easy to determine what constitutional legislation existed as a support for the tax proceedings of 1903, at the time those proceedings were taken. A general revision of the school laws enacted in 1900 (*Pamph. L., p.* 192) was adjudged unconstitutional, in *Lewis* v. *Jersey City,* 37 *Vroom* 582, and a subsequent revision (*Pamph. L.* 1902, *p.* 69) was held unconstitutional, in *Riccio* v. *Hoboken,* 40 *Id.* 649. The latter decision was promulgated September 21st, 1903, the decision of the Supreme Court in the same case (40 *Id.* 104) having been favorable to the constitutionality of the act of 1902. We find that the proceedings which resulted in the levying and assessment of the taxes in question conformed to the provisions of the act of 1902. This is not disputed. The elimination of that act would have necessitated a search for constitutional enactments antedating the revisions of 1900 and 1902 (a confusing task), but for the fact that shortly after the decision of the Riccio case the legislature met in special session, and not only enacted a new General School law, but also an act (*Pamph. L.* 1903, *Special Session, p.* 96) declaring that all contracts, bonds and obligations theretofore entered into, made or incurred, all appropriations, taxes and assessments theretofore made, levied and imposed, and all other acts theretofore had, passed, done or taken for school purposes under or pursuant to the provisions of any law declared by the court to be unconstitutional, were thereby validated and confirmed. We have no doubt of the constitutionality of this validating act, and hence may deal with proceedings antedating its passage, and taken pursuant to the acts of 1900 and 1902, respectively, as being valid in law.

Of the $3,057.19 now in controversy, approximately one-half was assessed for the share chargeable upon the taxpayers of Deal borough out of a special school district tax of $3,525 appropriated and ordered to be raised by the voters of the combined school district at their annual meeting, held March 17th, 1903, for the purpose of paying teachers' and janitors'

salaries and for fuel, repairs, tuition, &c.  The remainder of the moneys in question were assessed and collected as the quota chargeable against the taxpayers of Deal borough out of a total tax of $3,690 ordered by the district president and district clerk of the combined school district to be raised for paying principal and interest moneys falling due during the school year upon the bonds of that district.

The case shows that the school building for whose construction these bonds were issued was erected in the spring of the year 1900, and is situate in that part of the territory of the township which is outside of the borough limits of Deal.  The total bond issue was $11,600, amounting, with interest, to $13,030.  Prior to the school year 1903, $9,340 had been paid for principal and interest, leaving unpaid only the $3,690 which fell due during the school year 1903-1904.

The School law provides what may be called an automatic tax—that is, operative without the annual approval of the voters of the school district—for the purpose of raising each year an amount sufficient to pay the bond or bonds of the school district maturing during the year, with the interest accruing upon the unpaid bonds.  Thus the statute law has stood at least since 1894.  *Pamph. L.* 1894, *p.* 515, § 20; *Gen. Stat.,* *p.* 3060, *pl.* 253; *Pamph. L.* 1900, *p.* 263, § 211; *Pamph. L.* 1902, *p.* 142, § 191; *Pamph. L.* 1903, *Special Session, p.* 39, § 100.  The language of section 191 of the act of 1902 in this behalf is that "whenever a township, incorporated town or borough school district shall have ordered and authorized the issue of bonds and the same shall have been issued, the district clerk shall each and every year issue to the assessor of the taxing district in which such school district shall be situate an order directing him to assess upon the owners of property in said taxing district and their estates, and the taxable property therein, an amount sufficient to pay the bond or bonds maturing in such year, together with the interest accruing upon all the unpaid bonds of such district. which order so issued as aforesaid shall be duly executed by said assessor.  The moneys so assessed shall be levied and collected by the collector of said taxing district, who shall, on

or before the fifth day of January next thereafter, pay the full amount so ordered to be assessed, levied and collected to the custodian of the school moneys of said school district," &c. Section 100 of the general act of 1903 contains identical language, and from this we derive the duty of the respondent with respect to proceedings from and after its approval, on October 19th, in that year.

By sections 181 and 182 of the act of 1902 (*Pamph. L., p.* 138), the collector of the municipality in which a school district was situate was made custodian of school moneys, with the duty of receiving and holding in trust all school moneys belonging to such district, whether received from the state appropriation, state school tax, district tax, appropriation or from other sources, and of paying out the same only on orders signed by the president and district clerk or secretary of the board of education, it being declared in section 182 in effect that the township committee, common council or other governing body of the municipality should have no control over moneys belonging to the school district in the hands of the custodian. By section 183, whenever in any school district there were two or more collectors, the board of education was to appoint a suitable person as custodian of school moneys. By section 184 the collector or treasurer of each municipality in which a school district was situate was required to pay to the custodian of school moneys the amount ordered to be assessed, levied and collected in such municipality for the use of the public schools therein, on the requisition of the board of education.

The provisions of the new School law with respect to the custody of school moneys and the duty of the custodian are of like import. *Pamph. L.* 1903, *Special Session, p.* 71, §§ 184, 185, 186.

The evidence in the case shows that the legal voters of the combined school district, at their annual meeting in March, 1903, ordered a special school district tax of $3,525, and that the assessors of the three municipalities whose territory formed the school district were duly notified of this, and also of the requirement for an assessment of $3,690 to pay principal and

interest upon school bonds falling due during the year. The three assessors met at the proper time and apportioned the moneys thus required to be raised among the taxpayers resident in their several municipalities, viz., Deal borough, Allenhurst borough and the township outside of the boroughs. The amount thus apportioned against the taxpayers of Deal borough was $3,057.19. The evidence also shows that the tax was properly assessed in Deal borough, and that sufficient moneys were realized by the respondent as collector of that borough to enable him to pay to the custodian of school moneys the amount assessed for school taxes. The claim of the relator for the payment of these moneys to him, if valid, has preference over the claims of the borough treasury upon the moneys in the collector's hands, under *Ross* v. *Walton,* 34 *Vroom* 435; affirmed, 38 *Id.* 688; *Coe* v. *Englewood,* 39 *Id.* 559.

At the beginning of the school year 1903-1904, the relator was custodian of school moneys for the combined district. He demanded payment from the respondent of the money in question on June 11th, 1904, which was before the termination of the school year. The relator at that time still remained custodian of the combined district, unless his office in that behalf had been terminated by the force and effect of the new General School law of October 19th, 1903.

Payment of the moneys is resisted on the ground that by section 32 of the latter act (*Pamph. L.* 1903, *Special Session, p.* 14) each township, city, incorporated town and borough was made a separate school district, thus abolishing the former combined district of Ocean township, and that by section 34 of the same act the new school district thereby established for the territory of the township of Ocean lying outside of the boroughs became invested with the title of the school building for which the bonds in question had been issued, and that by the terms of section 34 the outstanding bonded indebtedness was made the obligation of the board of education of this new district.

The question is whether this transfer of the burden of outstanding bonded indebtedness has reference to that portion

of such indebtedness for whose payment provision had already been made in the tax levies of 1903, and, if so, whether the legislature intended to effect the purpose by disarranging pending proceedings for the collection and transmission of taxes already levied to meet bond payments, or to reach the same end through the use of other means.

In seeking out the legislative intent upon these points we must have regard to the whole of the General School law of 1903 and the contemporaneous validating act, and must keep in mind the practical situation that confronted the legislature at the time they were enacted.

These acts were approved on October 19th, in the very midst of the "school year" previously established, and by the new act perpetuated for fiscal and administrative purposes, which began on July 1st. *Pamph. L.* 1893, *p.* 325, § 2; *Gen Stat., p.* 3050, *pl.* 206; *Pamph. L.* 1900, *p.* 281, § 264; *Pamph. L.* 1902, *p.* 165, § 242; *Pamph. L.* 1903, *Special Session, p.* 93, § 238. Everywhere throughout the state the public schools were being maintained and conducted pursuant to arrangements already undertaken for the full year. Fiscal budgets had already been made up in the several school districts, including provision for payment of all school bonds that were to mature during the school year. The operations of ordering and assessing local taxes for school purposes throughout all the school districts had already been completed, the moneys to be raised had already been appropriated to specific purposes exigent during the current year, and the taxes were in course of collection. Among the existing school districts there were many, like that of Ocean township, that had been made up by combining the whole or parts of the territory of adjoining municipalities. These the legislature designed to dismember, so that school district lines might thenceforth generally conform to municipal boundaries. Without doubt, the Ocean township district was only one of many combined districts that had bond payments falling due during the year, to meet which taxes had already been ordered, apportioned and assessed. We may therefore prop-

erly treat this typical instance as being distinctly presented to the legislative mind in the framing of the new act.

It was by section 32 that each township, city, incorporated town and borough was made a separate school district, and the two sections immediately following have reference to adjustments thereby necessitated. These sections are as follows:

"33. Whenever a new school district shall be created, the children residing in said new district shall continue to attend the schools in which they shall be enrolled until the end of the then current school year. In case there shall be a schoolhouse in such new district in which school shall then be maintained, the board of education of the school district from which such new district shall have been set off shall have charge and control of such school until the end of the then current school year, and shall pay the salaries of the teachers, janitors and other persons employed in such school until the end of said year. In case there shall be any balance at the end of said school year in the hands of the custodian of the school moneys of the school district to the credit of the school district from which said new district shall have been set off, said custodian shall certify to the county superintendent of schools the amount of such balance, and what portion of such balance was received from state appropriation, state school tax and interest of the surplus revenue, and what portion was received from district school tax. Said county superintendent of schools, upon receipt of such notice, shall divide between said districts that portion of the balance arising from the state appropriation, state school tax and interest of the surplus revenue on the basis of the aggregate number of days' attendance of pupils in the public school as ascertained from the last published report of the state superintendent of public instruction, and shall divide between said districts that portion of said balance arising from district school tax on the basis of the respective ratables of said districts, and shall issue an order in favor of the custodian of the school moneys of such new district for that portion of said balance found

to be due said district from the district from which it shall have been set off.

"34. In any new school district the board of education, in its corporate capacity, shall become vested with the title to all school property, real and personal, in such district, and if for the erection, repair or purchase of any such property there shall be an indebtedness for which the board of education of the school district to which said property originally belonged shall be liable, the said indebtedness shall be assumed by and become the obligation of the board of education of the school district which shall have become vested with the title to such property, and upon payment of said indebtedness by the school district originally liable therefor, an action may be maintained therefor by the board of education so paying the said indebtedness against the board of education of the school district which shall have become vested with the property for which the said indebtedness was originally incurred."

The act, by its two hundred and forty-seventh section, is made to take effect immediately. But this does not make its provisions operative previous to the time when, by their own terms, fairly interpreted, they become operative.

Dealing with the case before us as a typical case, for which the legislature intended to make provision, it will be observed that at the date of the approval of the new act (October 19th, 1903), the moneys that the respondent was engaged in collecting from the taxpayers of Deal borough for school purposes were public moneys that by force of legislation existing at the time the levy was ordered (coupled, if need be, with the validating act already alluded to) had been duly appropriated to specific public purposes, to wit, in part for the maintenance of education in the combined school district during the school year 1903-1904, and in part for the payment of principal and interest upon bonded indebtedness of the combined district maturing during the same year. These moneys, when collected, were no longer the property of the taxpayers of Deal borough, but were in every sense public funds in course of transmission to effectuate the ends for

which they had been appropriated. The municipal corporation of Deal borough had no possible claim upon them; on the contrary, that corporation and its governing body had been, by express legislative enactment, excluded from any control over or interference with them.

Conceding that the legislature, while enacting the new School law, might have diverted those moneys, or so much thereof as had been previously appropriated toward the bond payments, to another public purpose (such, for instance, as the reimbursement to the taxpayers of Deal borough of a part of what had been already taken from them towards the construction of a school-house which by the same act was vested in a separate school district), the question is whether, by a reasonable construction of the whole of the act of 1903, such a diversion of this portion of the public moneys from the purposes for which it had been raised was within the legislative intent. Our examination of the matter constrains us to reply in the negative.

Many considerations concur in leading us to this view. In the first place, it is manifest, from section 33, that the legislature realized and intended to avoid the confusion that would have resulted in fiscal arrangements already undertaken if the act had been made operative with respect to these at the date of its passage occurring in the midst of the fiscal school year. By the express terms of that section (applying them to the case before us), the school-house of the combined district was required to be maintained by the old board of education until the end of the then current school year, and the salaries of teachers, janitors, &c., were to be paid by them, and any balance remaining in the hands of the custodian at the end of the school year was required to be certified to the county superintendent of schools with the sources from which it was derived, and to be by him apportioned. The sources specified in the section include the district school tax. No more express mention is made of moneys raised for bond payments, but, of course, the legislature contemplated that there would be no balance remaining unexpended at the end of the year of any amount raised for payment of school bonds

maturing during the year, for the whole amount would have been expended in the payment of the bonds.

Again, the school laws of this and previous years make no distinction between moneys ordered to be raised by district tax for current school purposes and moneys required to be raised for payment of school bonds, so far as concerns the assessment and collection of the taxes and the turning over by the collector to the custodian of the amounts collected. It is a combined assessment, with whose apportionment neither the assessor nor the collector has anything to do. That is the duty of the board of education.

Moreover, it is reasonable to suppose that if the legislature, in enacting the School law of October 19th, 1903, had intended to relieve the taxpayers of Deal borough, and of other places similarly circumstanced, from all further payments for account of school bonds, they would have stopped the money in the hands of the taxpayer by nullifying tax proceedings *pro tanto,* and would at the same time have provided some other fund out of which the maturing bonds might be met. For it is most important to remember that the legislature has at all times (at least since 1894, as above pointed out), been scrupulously careful to safeguard bond payments against repudiation, or even deferment, at the instance of local taxpayers or local officials. Now, if by the new act they intended to stop the moneys that had been assessed and were in process of collection to meet bond payments accruing during the current year, in all cases where, by the force of the act, they created new school districts, it is manifest that at the same time they were driving the combined Ocean township school district, and all other school districts similarly situated, into the necessity of making default upon the public school bonds, for we have found nothing in the act to provide for any other source of payment, and it is plain there could be no other source except an additional tax levy upon the district which would be thus required to assume the entire payment of bonds maturing during the year.

And still further, if the legislature intended to subvert

pending tax proceedings in order to appropriate moneys that had been once devoted pursuant to law to specific public purposes and devote them to some other public purpose (as in the case before us, typical of many others, to divert the moneys of the taxpayers of Deal borough previously appropriated and ordered to be raised to pay bonds of the combined district), it is significant that the legislature has not in terms declared that this shall be done, and has not expressly, nor, as we conceive, has it by implication pointed out to what other public purpose these moneys shall be devoted.

It is not reasonable to attribute to the legislature an intent to cause such confusion and such impairment of the credit of school districts without clear language requiring it. We find no such language in the act of 1903. We find language indicating, on the other hand, an intent to postpone the operation of the act with respect to all fiscal adjustments until the end of the then current school year. We think this is the reasonable construction to be placed upon section 33. And we find corroborative evidence of the same intent in the validating act approved on the same day and already alluded to, which, so far from disturbing in anywise previous appropriations, taxes and assessments, expressly validates and confirms them.

Nor do we find any sufficient evidence of a contrary intent in section 34 of the new General School law. Referring to the language of that section above quoted, and applying it to the case in hand, the "new school district" which is to become vested with the title of the school property is the district established by section 32 in that portion of the township of Ocean which lies outside of the bounds of the boroughs. Now, it is significant that there seems to be no provision in the act for the establishment in a corporate capacity of a board of education for such new district, prior to the annual school meeting to be held in March, 1904. Section 77 provides that in each township school district the members of the board of education shall be chosen at the annual school meeting. Section 79 provides that this meeting shall be held

on the third Tuesday in March. Section 84 provides that
each board of education thus elected shall be a body cor-
porate, and section 85 provides that the board shall organize
within ten days after the annual school meeting. Section
242 provides that members of the boards of education who
are residents of the territory contained in the several school
districts as constituted by this act, and who are now acting
as such, shall continue to serve for the full term for which
they were severally elected or appointed, as though elected
or appointed under this act. This would continue members
of the board of education of the combined school district of
Ocean township who were resident in that portion of the
township that lies outside of the boroughs as members of the
board of education of the new township school district, but
it has no bearing upon the question when the new board of
education is to begin its corporate existence. It is true that
by section 25, paragraph 4 of the act, the county superin-
tendent of schools is given power to appoint members of the
board of education for a new township school district to serve
until the next election in the district for members of the
board of education. But this power of appointment may be
fairly construed as limited to cases where there exists a
necessity for such appointment. Now, by section 33, the
ordinary functions of the board of education, with respect
to the charge and control of the schools, are expressly re-
served to the old boards until the end of the then current
school year; until that time there seems to be nothing for
the new board to do beyond meeting for the purpose of or-
ganization.

Upon the whole of the act, therefore, we are inclined to
think that the establishment of the new boards of education
required for the new districts created by section 32 was in-
tended to be deferred until the election of members of such
boards at the annual meetings to be held in March, 1904. If
this view is correct, then the taking effect of section 34 with
respect to the assumption by such new boards of education
of outstanding indebtedness must be postponed in like man-
ner, and the assumption would relate only to such indebted-

nesses for which a tax levy had not already been made at the time of the passage of the act.

But if this view is not correct, and the legislature intended by section 34 that the new district should assume payment of outstanding school bonds that fell due during the school year 1903-1904, still section 34 is clearly consistent with the view that those obligations should be paid by the combined district out of the moneys already ordered to be raised by tax for that specific purpose, and that the remedy of the combined district against the new district should be by action for reimbursement, pursuant to the express provisions of section 34 in that behalf. The moneys recovered in such a case would, of course, be subject to apportionment among the several school districts that resulted from the dismemberment of the combined district, such apportionment being provided for by section 33.

And so, upon a review of the whole of the act of 1903, we are unable to give to it such a force and effect as to absolve the collector of Deal borough from the duty of turning over to the custodian of the combined district the taxes that were collected in the year 1903 from the taxpayers of the borough pursuant to the appropriation and levy that antedated the act of 1903.

The argument to the contrary is rested largely upon the hardship that results from requiring the taxpayers of Deal borough to contribute further toward payment of the school bonds of the combined district when by the same act the school-house for whose construction the bonds were issued was practically taken from them. In one of the views above suggested for the interpretation of section 34, the moneys now payable would eventually be restored by means of an action against the new district and an apportionment of the proceeds thereof. In this event there would be no hardship beyond a temporary inconvenience. But even though that view be untenable, so that the moneys now payable are never to be restored either directly or indirectly, still, unless there be some express provision of law to relieve this hardship, it must be dealt with by the courts as one of the necessary

incidental burdens of government. It is impossible that any system of taxation shall be absolutely just to every taxpayer. Approximation to justice is all that is possible and all that the constitution requires. It must be remembered that the inhabitants of the combined district were already legally liable for the payment of the bonds, their public credit having been already pledged in that behalf by authority of the legislature. The real hardship of the act of 1903 consists in depriving them of property in the school-house. If the hardship of paying their quota of the $3,690 which fell due during the school year in question must be considered in solving the question of statutory construction, what is to be said with respect to the larger sum previously contributed by the taxpayers of the borough as their quota towards paying the $9,340 of principal and interest upon bonds that had been liquidated by the combined district previous to the year in question? It is manifest that wherever in the state a combined school district had a school building previously erected from the proceeds of combined taxation, the force of the act in rendering school district lines conformable to municipal boundaries necessarily resulted in hardship to some of the taxpayers. Doubtless the legislature deemed that the general benefits of the new adjustment of district lines outweighed its incidental burdens.

Nor, as we think, can the respondent place himself in the attitude of resisting the payment now in controversy, on the ground of any equity supposed to inhere in the municipality of Deal borough or in the taxpayers resident within that borough. He is not their agent or representative in this matter, but, on the contrary, is a public functionary of the state, charged by law with specific public duties. It happens that the legislature, from motives of convenience, selected the borough collector as the public agent for the collection of school taxes. But it might have selected any other public agency. His duty in this behalf is not to the taxpayers from whom he has collected the money, nor to the borough in which his municipal functions are exercised; his duty as a public agent is to transmit to the relator, as

the public agency designated for the purpose by law, the public funds which he has been instrumental in gathering from the taxpayers. From the moment the tax was lawfully collected the individual taxpayers lost all property interest therein. The municipality never had any interest in the moneys, being expressly debarred therefrom by law.

For these reasons we are of the opinion that a *mandamus* should issue, and as the matter is of public importance, and the facts are not at all in dispute, it may be peremptory in form.